IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 4, 2006 Session

## NANCY WOODALL HUNT v. GARY FRANKLIN HUNT

**Appeal from the Circuit Court for Davidson County**
**No. 04D-1267     Carol Soloman, Judge**

---

**No. M2005-00855-COA-R3-CV - Filed on June 28, 2006**

---

Husband appeals the action of the trial court asserting that the trial court erred in denying his *pro se* motion for a continuance after allowing his attorney to withdraw. He further asserts that the trial court erred in the disposition of marital property. The action of the trial court in denying a continuance and granting a divorce to Wife is affirmed. The action of the trial court on all other issues is reversed, and the cause remanded for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part,
Reversed in Part and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL and FRANK G. CLEMENT, JR., JJ., joined.

Lance B. Mayes, Nashville, Tennessee, for the appellant, Gary Franklin Hunt.

Helen S. Rogers and Audry L. Anderson, Nashville, Tennessee, for the appellee, Nancy Woodall Hunt.

### OPINION

Gary Franklin Hunt and Nancy Woodall Hunt were married for thirty (30) years during which Mr. Hunt was the breadwinner and Mrs. Hunt was the homemaker. They parented, raised and educated three children. Mr. Hunt rose to the pinnacle of the architectural engineering profession, and his family enjoyed the luxury and benefits of an annual income of more than half a million dollars. Mr. Hunt, former CEO of Gresham, Smith and Partners, sold his interest in that firm with such sale including a deferred payment buyout by Gresham Smith which yielded Mr. Hunt a $15,000 per month payment for five (5) years.

Mrs. Hunt filed suit on May 21, 2004, against Mr. Hunt for absolute divorce on grounds of inappropriate marital conduct, drug addiction and cruel and inhuman treatment. She was granted a restraining order *pendente lite* relative to use of the marital home. An Agreed Order was entered

August 10, 2004, dividing the $15,000 monthly payments from Gresham, Smith and Partners with $8,537 per month going to Mrs. Hunt and the remainder to Mr. Hunt. On August 13, 2004, Mr. Hunt filed an Answer and Counterclaim for Absolute Divorce with Mrs. Hunt filing her Answer to the Counterclaim on August 18, 2004.

On September 3, 2004, Mrs. Hunt filed a Motion to Modify *Pendente Lite* Support asserting again the drug addiction of Mr. Hunt and stating:

> 6. Wife would show that Husband's continued drug use increases the likelihood that Husband will dissipate the parties' limited marital estate as, rather than spending his money to preserve the assets of the marital estate, Husband is most likely spending his money to support his drug habit. Such behavior will leave both of them without sufficient means of ability to support themselves following this divorce.
>
> Wife would, therefore request that the monies being paid to Husband as a result of the buy-out of his interest in Gresham Smith & Partners be immediately reduced. wife requests that Husband be provided with a sum sufficient to meet his essential needs and no more. Wife would further request that any remaining portion of the monies payable to Husband on a monthly basis be paid into an interest-bearing account maintained by the Clerk of this Honorable Court. Wife requests that the *pendente lite* support paid to her remain unchanged.

On September 15, 2004, Wife filed a Motion for Accounting in which she asserted:

> COMES NOW the Plaintiff/Wife, by and through counsel, and respectfully moves this Honorable Court for an Order requiring the Husband to account for any and all monies received by him as a result of the Court's *pendente lite* Order. For just cause, Wife would show that she believes that Husband, as a result of his continuing drug abuse, has dissipated the assets of the marital estate and continues to do so.
>
> Wife would further show that Husband receives approximately Five Thousand Seven Hundred Fifty-Five Dollars and Sixty Cents ($5,755,60) each month; however, Wife is informed and believes that Husband was recently threatened with the termination of his utilities for his failure to pay the outstanding bills. Wife believes that Husband is using the funds he receives to buy drugs, solicit prostitutes, and pay for hotel rooms rather than provide for his necessities.
>
> Wife would, therefore, request that Husband be required to account for any expenditures he makes from the funds received as a result of the Court's *pendente lite* order.

On September 10, 2004, Wife's Motion to Modify the *Pendente Lite* Support was denied. On October 5, 2004, the trial court entered an Order Granting the Wife's Motion for an Accounting and setting the case for trial on February 7, 2005.

From this point forward, the record of the proceedings is not easy to follow. A hearing was held on December 20, 2004, but the order reflecting the results of that hearing was not entered until late in the afternoon of January 6, 2005. That order provided:

> This cause came on to be heard on 20th day of December 2004, before the Honorable Carol Soloman, Judge of the Eighth Circuit Court for Davidson County, Tennessee, on the Wife's motion to compel answers to discovery and to prevent further disbursements prior to the hearing of divorce which is set in this cause on February 7, 2005. After hearing the announcement of the parties that counsel for Gresham Smith Partners' interpretation of the Court's prior Order was that it would prevent any further distribution of any year-end lump sum amounts until the divorce is tried, and since the Court had specifically ordered the Partnership to only make equal distributions of the monthly stipend agreed upon previously between Mr. Hunt and Gresham Smith Partners, the Court affirmed that that was indeed the Court's decision that no further monies should be distributed to Mr. Hunt except for the previously ordered monthly stipend until the final hearing of this cause. The Court also required that Mr. Hunt answer discovery on or before noon on January 7, 2005, or his pleadings would be struck. It is, therefore,
>
> **ORDERED, ADJUDGED AND DECREED** that the Wife's motion to prevent any further distribution of assets is granted; provided, however, that Gresham Smith Partners, Mr. Hunt's former employer, may continue making monthly stipend payments to him and to the Wife, as previously ordered and as appropriate, but that they shall not make any further distributions pending further orders of this Court in the divorce action; and it is further
>
> **ORDERED, ADJUDGED AND DECREED** that the Husband is ordered to fully and completely answer all of the interrogatories and request for production of documents served upon him on September 7, 2004, by counsel for the Wife, and such answers are to be made on or before **noon on Friday, January 7, 2005**; and it is further
>
> **ORDERED, ADJUDGED AND DECREED** that if Mr. Hunt fails to provide full and complete answers to the interrogatories and request for production of documents prior to noon on January 7, 2005, that his pleadings in this divorce case shall be stricken.
>
> **DATED** this the 6th day of Jan., 2005.

-3-

On January 5, 2005, counsel for Mr. Hunt filed a Motion to Withdraw. On January 7, 2005, Mrs. Hunt filed a Motion for Sanctions and for Default based upon the failure of Mr. Hunt to respond and seeking to have the pleadings of Mr. Hunt stricken from the record and an order of default entered in her favor.

As the result of a hearing held on January 14, 2005, the trial court entered an order on January 24, 2005, providing:

> This cause came on to be heard on 14th day of January, 2005, before the Honorable Carol Soloman, Judge of the Eighth Circuit Court for Davidson County, Tennessee, on the Wife's motion to strike the Husband's pleadings for noncompliance with discovery and Mr. Bobby Jackson's motion to withdraw, it appearing to the Court that this divorce action was filed on May 21, 2004, and the Husband was duly served with such complaint on July 21, 2004. Husband had been served with interrogatories on September 7, 2004, and was given an extension of more than thirty (30) additional days to answer discovery on November 5, 2004. Wife then filed a motion to compel interrogatory answers which was heard on December 20, 2004, and Mr. Hunt was ordered to answer discovery no later than January 7, 2005. No answer was filed by Mr. Hunt and , thus, Mr. Hunt having failed to comply with the Court's discovery order, his pleadings are stricken and his attorney is allowed to withdraw. The Court specified that Mr. Hunt could hire new counsel but that the entry of any new counsel in this matter would not delay the final trial which is set for February 7, 2005. It is, therefore,
>
> **ORDERED, ADJUDGED AND DECREED** that Robert L. Jackson is allowed to withdraw as attorney of record for the Defendant, Gary Hunt, and that the Defendant may hire additional counsel to represent him at the final hearing of this cause which is scheduled for February 7, 2005; provided, however, that whether Mr. Hunt represents himself *pro se* or obtains other counsel, the parties final divorce hearing shall not be continued or delayed from the date of February 7, 2005, when it is set for final hearing; and it is further
>
> **ORDERED, ADJUDGED AND DECREED** that the pleadings filed on behalf of the Defendant, Mr. Hunt, by his prior attorney, and specifically his answer and counter-complaint shall be struck as an additional sanction based on the Defendant's failure to comply with this Court's discovery order and to answer interrogatories or request for production of documents propounded to him September 7, 2004; and it is further
>
> **ORDERED, ADJUDGED AND DECREED** that Wife is granted a divorce by default judgment against the Husband for her pending divorce complaint and that the Court will hear testimony concerning an equitable division of the marital assets

and other support issues at the final hearing on February 7, 2005, at 9:00 a.m., when this case shall be heard on the Court's uncontested docket.

Efforts of Mr. Hunt to retain new counsel were unavailing, and when the case came on for hearing February 7, 2005, he appeared *pro se* requesting a continuance which request was denied by the trial court.

In the Final Decree of Divorce following trial on February 7, 2005, and entered on February 14, 2005, the trial court granted Mrs. Hunt a divorce on grounds of inappropriate marital conduct and drug and alcohol addiction. We address first this portion of the case as it dealt with grounds for divorce. The sparse record before the Court clearly establishes that Mr. Hunt, retiring early at the pinnacle of his profession, then fell to pieces in addiction to crack cocaine, consorted with prostitutes, abandoned his marriage and apparently lost all sense of direction. As relates to the case at bar, he disregarded, without any explanation, any response to court ordered discovery and had ample warnings of the sanctions which would be visited upon him by such noncompliance. He asserts no valid basis for a continuance of the February 7 trial and cannot show an abuse of discretion in the trial court's refusal to grant such continuance. *Marber and McMurray, Inc. v. Top-Flight Dev. Corp.*, 720 S.W.2d 469, 471 (Tenn.Ct.App.1986).

The trial court's grant of divorce to Mrs. Hunt is supported by the undisputed evidence in the case and such action is affirmed.

The primary and more serious issue on appeal is the trial court's determination of and distribution of the marital property of this marriage.

At the outset the governing statute clearly provides:

> In all actions for divorce or legal separation, the court having jurisdiction thereof may, upon request of either party, and prior to any determination as to whether it is appropriate to order the support and maintenance of one (1) party by the other, equitably divide, distribute or assign the marital property between the parties without regard to marital fault in proportions as the court deems just.

Tenn.Code Ann. § 36-4-121(a)(1).

It is against this statutory mandate that the actions of the trial court beginning with the February 7, 2005, hearing must be considered. The total participation of Mr. Hunt in the February 7, 2005, proceedings appears from the transcript. The opening statement of Mr. Hunt discloses:

> MR. HUNT: I apologize, Your Honor, for running out to my car. I didn't hear all of Ms. Solomon's experts.
>
> THE COURT: That's Ms. Rogers.

MR. HUNT: I was unable to retain an attorney after mine withdrew. Just everybody ran from me. Nobody would secure my case. And I went to the extent of going on the Internet, putting out a standard request, giving them the facts of the case. I only got one response. They reviewed my materials and just didn't have the time to prepare for it.

So I would humbly ask the Court that I have an opportunity to retain an attorney.

THE COURT: That request is denied.

MR. HUNT: Yes, ma'am.
I would like to take the opportunity to rebut some of what Ms. Solomon said.

THE COURT: That is Ms. Rogers. I am Judge Solomon.

MR. HUNT: I'm sorry. I'm off to a bad start, aren't I, Judge? I'm sorry.
My story hasn't gotten out. It's been mostly my fault, but I'd like to use this last opportunity to get my story out because there's two sides to every story, and – –

THE COURT: You'll be able to cross-examine her. Your pleadings have been struck, so we don't have the story. But you can cross-examine her when she testifies and then tell me, you know, what you think is fair and what you think you should have.

MR HUNT: Yes, ma'am.

THE COURT: This is quite a long marriage.

MR. HUNT: Yes, ma'am. And if I stray in my discussion here, then you tell me I'm out of line.

THE COURT: I will; yes.

MR. HUNT: Regarding to the RV and house payments, I was absent from the home a lot of times over the end of this marriage before the divorce was final, but long before these orders took place, my wife was receiving half of my income or whatever it took to satisfy the debts. There was always enough money to satisfy any car note, any house note, and RV note.

The house note should have been paid. There was money available. I don't have witnesses right now but can prove that it was always available to pay these payments.

My son was granted power of attorney to work with my wife to make these payments. I made sure that happened in my absence so that things would get taken care.

THE COURT: Tell me about the RV.

MR. HUNT: The RV was – – my understanding is that my wife was making payments on this. I was unaware there were arrears in the payment. As soon as I became aware in August of last year that it had been repossessed – – I've always paid my payments – – I immediately secured – – the Court didn't have to tell me. I was going to get that out of repossession.

THE COURT: So is it current?

MR. HUNT: Ma'am?

THE COURT: Is it current?

MR. HUNT: Yes, ma'am. It's current right now.

THE COURT: Okay. And what have you done to sell it?

MR. HUNT: I couldn't get access to the RV. The RV was supposed to be available to me to sell, and I could have sold or done something with it. I wanted the RV. The RV is worth much less than the more – –

THE COURT: How much is it worth?

MR. HUNT: I'd say in the marketplace, maybe 65, 70 thousand dollars, and the payoff is probably closer to 85, 90. It's not a time to sell an RV. I was unaware it was in arrears. My wife and – –

THE COURT: But it's not anymore?

MR HUNT: No. By court order, she was to make the payment, and I was to sell. I was not even aware where it was at.

THE COURT: Well, it was your responsibility to make that – --

MR. HUNT: I worked with my –

THE COURT: What about the motor for it?

MR. HUNT: I have an idea it was secured.

THE COURT: You can't just walk away and say, oh, well, I didn't know about any of these payments, and I didn't k now about any of this stuff because I was gone doing other things.

MR. HUNT: When I became aware, I corrected it, every situation, I corrected it.

THE COURT: So you've made all those payments?

MR HUNT: By court order, she had to make the payments. As of August, I was supposed to pick up the past due, which I did.

THE COURT: How much did you pay?

MR HUNT: Had to be 3,000, 3,500. I was three payments behind. I had no idea those payments were in arrears. I made – – ma'am, could I have a glass of water?

THE COURT: So 85,000 you believe is still owed. What about your IRA?

MR. HUNT: IRA is intact, $300,000. It's with her bank.

THE COURT: Have provided any of the records to Mr. Rogers?

MR. HUNT: I have the records. I have not – I met – – I stand responsible for – – my attorney was aware of certain situation in my life.

THE COURT: I don't care about your attorney. He's off. He filed to get off a long time ago. And on the 14th of January, he was allowed to get off. So tell me – – well, maybe you can't. You seem to be double-talking right now.

MR. HUNT: No, ma'am.

THE COURT: How much was in your retirement account that you transferred?

MR. HUNT: That I don't have available this morning. I requested my attorney again – –

THE COURT: Well, today is the day, so what you don't have available, then I have to presume you're hiding something from it. You have not provided it to Ms.

Rogers, and you've not been forthcoming. This divorce was filed May of '04. you've had 11 months – – 10 months. That's plenty of time.

MR. HUNT: May I talk to them?

THE COURT: Well, not unless you have something to say that would help me. I'm not going to let you just rattle on. Please tell me what you want to say that would help. I don't care.

MR. HUNT: Do I have a right to an attorney?

THE COURT: You certainly did, and you do.

MR. HUNT: How can you – – you are excluding me from my case, and I have not had time to retain – --

THE COURT: I'm sorry. That's not my fault. Anything else you want to say?

MR. HUNT: Well, a lot, if I would be allowed to say it. I have not had a chance to present my case, and the case is solid.

THE COURT: You're not going to present a case.

MR. HUNT: Well, thank you. I guess – –

THE COURT: A default has been entered against you. Your pleadings have been struck. You have no case. But you have a right to defend yourself, and that's what I'm going to allow you to do.

MR. HUNT: With regard to the RV, let the court records show I kept the payments up. I was unaware – – she hid the bills from me.

THE COURT: I'm going to let you do that. You don't have to tell me all that. You've already, about six times, and when she testifies, you'll be able to cross-examine her.

MR. HUNT: I may do that.

THE COURT: Okay.

MR. HUNT: Let me go through some of the things I heard her say. The tax return has been extended. I'm working with my accountant right now to file a tax

return. It's well within the boundaries of filing a late tax return, 2003. My attorney negotiated with Ms. Rogers that I would be responsible – --

THE COURT: Negotiations are not supposed to be part of the court order.

MR. HUNT: Let me just say, the court order – – the tax returns are well in process, and I'm responsible for them.

THE COURT: The last date due was October, so I am going to make you responsible for them. Why have they not been filed – – okay. The '04, that's the last extension that's granted?

MR. HUNT: It's typical in business situations as complex as mine for tax returns to go on for a while.

THE COURT: I hope you'll be able to tell me what's so complex.

MR. HUNT: I'm partner of a firm for 25 years.

(Off the record.)

THE COURT: You are mumbling. It's hard to understand you. Please talk slower and clearer. The court reporter is unable to get what you're saying because your words are slurred.
Go on. You say you're working on the tax problem, but she wants to file separate from you.

MR. HUNT: I assumed she would file separately. That's what I assumed she would. That's the path of least resistance for her.

THE COURT: I didn't hear what you said, the next sentence, because your voice dipped down, but maybe I don't need to.

MR. HUNT: I apologize. I feel under attack, and I'm talking too quick.

THE COURT: Slow down because it's impossible to understand you. Go ahead.

MR. HUNT: I have nothing else to say.

THE COURT: All right.

The limited direct testimony of Mrs. Hunt follows and appears on pages 17 through 33 of the transcript, after which Mr. Hunt undertook to cross-examine her.

BY MR. HUNT:
Q          Let me talk about the house.
           How much have we been led to believe that our house is valued at in the marketplace?
           THE COURT: She can't hear you.

BY MR. HUNT:
Q          How much are we led to believe that our house is valued in the marketplace by virtue of the assessor's – --
           THE COURT: Why don't you just ask her what – –

BY MR. HUNT:
Q          How much is our house valued at in the marketplace, in your opinion?
A          I'd say it is more than what is on this sheet as being appraised.
           THE COURT: His question was how much and so far, I don't think anything – –
           THE WITNESS: I would say it would probably sell on the market for 500,000.

BY MR. HUNT:
Q          Just 500,000; are you sure of that?
A          That's what I would price it – –
Q          We talk in terms of much more than that, ma'am.
           THE COURT: When you ask her a question, you must allow her to finish the answer, or otherwise you don't need me here. So what did you say about the 500,000?
           THE WITNESS: I believe it's worth that as of today.
           THE COURT: Okay. Next question.

BY MR. HUNT:
Q          Your attorney made the statement we owed about as much as it's worth. Do you believe that to be true?
A          According to the bank, it is.
Q          Right now you are getting paid about half of Mr. Hunt's income. How was that established? How was your award by the Court of my money determined; do you remember, Mrs. Hunt?
A          Because you had moved out, and I had to pay bills.
Q          Mrs. Hunt, didn't the Court require us to prepare a statement of our financial needs and document that, and then thereby ordered so much money, which is more than half, to you to pay those payments?

-11-

A          I get $8,493 a month.

MR. HUNT: Judge, could I have her answer my question?

THE COURT: I'm sorry?

MR. HUNT: Judge, may I have a direct answer. She's not answering my questions directly?

THE COURT: Your questions are so convoluted, and her answers are – --

MR. HUNT: My I try again?

THE COURT: Please.


BY MR. HUNT:

Q          You have income at this point in time from my stock investments; correct?

A          From Gresham Smith.

Q          How was that number determined?

THE COURT: How was the amount of income determined?

THE WITNESS: I guess by Gresham & Smith.

MS. ROGERS: Your Honor, it was an agreed order. This is not a difficult issue.

THE COURT: Okay.

MS. ROGERS: Between Mr. Jackson and myself.

THE COURT: Did you come to court and you-all agreed on an amount for him to pay you?

THE WITNESS: today?

THE COURT: No.

MS. ROGERS: August is what it was.

THE WITNESS: August was when it was.

THE COURT: Okay. All right. I feel like I'm walking through marshmallows or oatmeal.

Listen to the question. I know you're nervous, but try to answer the question if it's not tricky.

Did you come to court to get temporary support, and it was awarded by an agreement?


THE WITNESS: That wasn't done last May

MS. ROGERS: No, last August.

THE COURT: No one said anything about May.

THE WITNESS: I got $400 extra starting in August to help pay for the RV.

THE COURT: No one mentioned the RV. We're just talking about where you got your money. He wants to know where it was ordered. Was it ordered by the Court by agreement?

THE WITNESS: Yes.

-12-

THE COURT: Okay.  Next question.

BY MR. HUNT:
Q            Was that order developed by your attorney based on your information?
            THE COURT: She already said yes.
            MR. HUNT: To cover all of her expenses, there is an itemized list, Your Honor, of which she prepared covering the RV debt that was specifically used to calculate the percentage that she got.
            THE COURT: Can you ask a simple – – maybe you-all have spent years of talking like this to each other, but I can't understand either one of you.
            MR. HUNT: I can't make my questions any more direct.
            THE COURT: Then – --
            MR. HUNT: Let me try again.
            THE COURT: You're going to confuse me.  It's real simple question, real short.  It doesn't have to be real wordy.  You're not getting paid by the word.

BY MR. HUNT:
Q            Have you ever worked outside the home in our marriage?
A            Yes.
Q            Could you tell the Court where and when a statement was made that you have not – –
            THE COURT: Okay.  Don't quote statements.
            THE WITNESS: I told my attorney that I've worked, and when I was pregnant with our oldest child, I quit.  I worked at Liberty Mutual Insurance Company for seven years, when we got married.

BY MR. HUNT:
Q            Mrs. Hunt, may I ask you why you haven't worked outside the home? Have you been – –
            THE COURT: So you haven't worked outside the home in 28 years; it that correct?
            THE WITNESS: I worked part time at a retail store.
            THE COURT: Okay.  When was that?
            THE COURT: How long did you work there?
            THE WITNESS: About three and a half years.
            THE COURT: What retail store?
            THE WITNESS: It was Carroll Reed.
            THE COURT: How much did you make an hour?
            THE WITNESS: Six dollars.
            THE COURT: Okay.

BY MR. HUNT:

Q Mrs. Hunt, why did you not continue to work for Carroll Reed or some other retailer?

A They closed the store.

Q Mrs. Hunt, when did you file for divorce against Mr. Hunt?

  THE COURT: I can look at the pleading and tell you.

  THE WITNESS: May of '04.

BY MR. HUNT:

Q Where was Mr. Hunt at the time you filed for divorce?

A I have no idea.

Q Mrs. Hunt, was he not in treatment at that time?

A He got out May 21. I did not hear from him till July, saying that you had just got your papers. They tried to serve them on you before, and you were never at your apartment.

Q Mrs. Hunt, did Mr. Hunt talk to you? Did y'all talk while he was in treatment?

A Yes.

Q What did y'all talk about; was it about the future?

A We tried that, but it didn't help.

Q. Mrs. Hunt, Cumberland Heights has a family day program, successful. Why did you not participate in that?

A Because I didn't want to.

Q Mrs. Hunt, did you tell Cumberland that you were going to participate?

A Yes.

Q Did you call them back to tell them that you weren't going to participate?

A I did call them back and – – excuse me?

Q To say you weren't going to participate.

A I had told them that the first time.

Q Mrs. Hunt, did you and your husband, Mr. Hunt, talk when you were released from treatment, and you did not want him to come home?

A Yes, but – –

Q What did Mr. Hunt – – I'm sorry.

A But when you got out of Cumberland Heights this last time, you got our youngest son to go get you, and you had called me and told me you were at a safe house, a transitional house. Instead, you went to Hampton Inn, and you couldn't get in there, so you went to Super 6 – –

Q You didn't – –

  MS. ROGERS: He's interrupting her answer.

  MR. HUNT: I don't have a question.

  THE COURT: Stop interrupting her answer. Go ahead. So he got a motel?

THE WITNESS: Yes.

THE COURT: So are you saying he lied again?

THE WITNESS: Yes.

MR. HUNT: May I re-rebuttal my own question, Your Honor? She's providing – --

THE COURT: Only if you want to really confuse me. Then I'll just leave.

MR. HUNT: Okay.

THE COURT: Ask her the next question. This is not your – –

BY MR. HUNT:

Q          Mrs. Hunt, did Mr. Hunt visit you after his release from Cumberland Heights on a continual basis?

THE COURT: After the divorce was final?

MR. HUNT: After the release from Cumberland Heights.

THE COURT: The divorce was filed the day he got out; right?

MR. HUNT: Before – --

THE COURT: I'm not talking to you, Mr. Hunt.

Mrs. Hunt, you filed the 21st of May, and he got out the 21st of May; is that correct?

THE WITNESS: Yes.

THE COURT: Anything – –

THE WITNESS: I believe that's right.

THE COURT: Anything after she filed for divorce is not relevant, so – –

THE WITNESS: I'm sure my attorney - -- that is in the records, but – –

THE COURT: You think that's correct?

THE WITNESS: Yes.

THE COURT: Next question.

BY MR. HUNT:

Q          Mrs. Hunt, how would you characterize your and Mr. Hunt's marriage before the cocaine problem?

A          I thought it was fine. We did things together. We took trips, went to sports, athletics.

Q          Mrs. Hunt, for 29 years, exclusive of the cocaine era, about one year – –

THE COURT: Are you testifying or are you asking her?

MR. HUNT: I'm just trying to get through it the best I can.

THE COURT: Why don't you ask her?

-15-

BY MR. HUNT:

Q             Was Mr. Hunt – – would you characterize him as excellent to poor as a provider for your family?

A             Yes.

Q             Excellent or poor?

THE COURT: That wasn't a yes question.

THE WITNESS: I said excellent.

BY MR. HUNT:

Q             What kind of husband was he to your family – – excellent or poor?

THE WITNESS: Do I have to answer that?

THE COURT: Well, you can – –

THE WITNESS: Can I take the Fifth Amendment?

THE COURT: No. It's not a criminal offense. No, you can explain it. You know, you can tell me when he became a bad husband or what he did not do, but, of course, the drug use is – –

THE WITNESS: Twenty-one and a half months.

THE COURT: So it wasn't a year, like he's trying to – –

THE WITNESS: I don't know.

THE COURT: Twenty-one and a half months. Tell me about that drug use.

THE WITNESS: It was crack cocaine.

THE COURT: And how did you find out about it?

THE WITNESS: Because I would find the crack pipes in the house; some marijuana in the bags; the Brillo pads; coat hanger hooks bent where you pack it in there, I guess; and ink pen filters that had been taken out of ink pens, where they had also been used.

MR. HUNT: Your Honor, how much is – --

THE COURT: When did he admit to you that he was doing drugs?

THE WITNESS: At one point in time he finally told me.

THE COURT: And did he say how he got hooked?

THE WITNESS: No. I can tell you my opinion.

MR. HUNT: May I ask a question, Your Honor?

THE COURT: Okay. And what's your opinion?

THE WITNESS: That prostitutes not only sell themselves, but they sell crack cocaine.

THE COURT: All right. Next question.

BY MR. HUNT:

Q             Mrs. Hunt, do you remember the exact timing of your first knowledge of Mr. Hunt's use of drugs, the very first time? Do you remember that time, Mrs. Hunt?

A        It was probably in June of 2003.

Q        The circumstance, I'm after, Mrs. Hunt.

A        You were not living at the house, and you were living in an apartment down in Bellevue. You had two body guards. you had a white woman, a black woman living in that apartment, and you told me that one of them did crack cocaine, and you would not let her smoke in that apartment.

Q        Mrs. Hunt, did not – --

THE COURT: He told you two women were living there, that they were body guards?

THE WITNESS: No. The two black men were body guards. They were their girlfriends.

BY MR. HUNT:

Q        Mrs. Hunt, let me refresh your memory about it. Did Mr. Hunt, the very first time using crack cocaine, before you just mentioned, come and tell you after a three-day absence from the home – – was he not in tears and ashamed and went to the hospital the very first time he was – –

THE COURT: That's about 18 different questions. Are you ever going to object to improper questioning?

MS. ROGERS: I'm sorry, Your Honor. I'll object.

THE COURT: All right; sustained.

MR. HUNT: Your Honor, I'm through with the real world. I'll have a seat. Go ahead.

THE COURT: Take a seat.

With this effort at cross-examination by Mr. Hunt concluded, the one witness to provide substantial and material evidence concerning the marital property, particularly as related to Gresham, Smith and Partners, Mr. Craig Gabbert testified. At the conclusion of his testimony, Mr. Hunt declined to cross-examine him and asked for a recess asserting that he was "extremely nauseous." This recess was granted, and Mr. Hunt then absented himself from further proceedings, though no further testimony was offered on behalf of Mrs. Hunt.

With all evidence concluded, the record discloses the following:

THE COURT: Tell me what she was – – I want to give her alimony. Make that an exhibit.

(Marked Exhibit 9 in Evidence.)

(Off the record.)

MS. ROGERS: Your Honor, I've thought a lot about this, and I'd like to kind of give you my thoughts. I don't know that we want to give her alimony because then it's going to be taxable at a higher rate. If we do it as property division – –

-17-

THE COURT: I think we need to do both. He has capabilities of obviously making $150,000 a year just consulting.

MS. ROGERS: He gave away 180,000 a year.

THE COURT: A hundred fifty.

MS. ROGERS: But, anyway, he gave that away, so based on that, he has capabilities of making at least 150 a year, plus then the property division. I think she should get alimony based on the 150,000.

THE COURT: He also took a very early retirement.

MS. ROGERS: Absolutely, and lost that income, and she doesn't have the ability to earn any kind of income that would put her anywhere near what they – –

THE COURT: She has nothing, but she couldn't even buy her clothes.

MS. ROGERS: I know. Your Honor, the courts are required to do an equitable division of the assets and liabilities of a marriage. I think there's a factor in this that weighs toward a very unequal but equitable division, and that is, I believe, any money the Court gives Mr. Hunt is going to go to drugs.

THE COURT: I want the record to reflect that the Court observed his behavior and felt that he was using drugs at the time he appeared. His speech was so fast, it was difficult for the Court to understand, and he was extremely agitated, and he began sweating profusely, and his thought pattern was very fast, and I thought he was on cocaine.

MS. ROGERS: Obviously, he's left, which speaks volumes as well. So we would propose that instead of Mr. Hunt paying Mrs. Hunt anything, that Mrs. Hunt be awarded all of the remaining payout, that she pay Mr. Hunt a relataively [sic] modest sum, maybe 1,500, 2,000 a month that he can live on until he's age 62 because, given the income that he was generating, at age 62 he could draw, I would guess, a significant amount of Social Security – – I'd say maybe 2,000 a month in Social Security – – and that we just not support his drug habit.

THE COURT: I agree. And what about his IRA?

MS. ROGERS: We don't know what's left of it.

THE COURT: Put a restraining order against Pinnacle disposing of any more, and that they are to transfer all of it to her as the division of property.

And the thing is, I really would like him to pay alimony, but it does not appear – – what we'll do is, he'll pay her a dollar a month alimony, so if he ever conquers the drug habit, she may come in and ask for the sum that's comparable to what she should be awarded, which is – – what do you want to do with that terrible RV?

MS. ROGERS: That's just a disaster, Your Honor. I think the only thing to do is just give her authority to sell it and get what she can for it, and she's got to be responsible for the note because she, unfortunately, signed it, and so we're stuck with it.

-18-

THE COURT: Yeah.

MS. ROGERS: If we give it to him, we may lose the whole amount we owe, and if we keep it, we may at least be able to get something for it.

THE COURT: Whatever the amount is left, let's make him be responsible for and hold her harmless.

MS. ROGERS: But, in reality, we know she will have to pay it.

THE COURT: Yeah. $1,500 a month is by far the amount she should give him. It's not as alimony. It's his share of the marital expense until – – his last payment is 2007. That's his last amount, so after that year, she doesn't have to give him anything, and she may revisit the alimony anytime that he's to award her.

I also want a judgment amount of $11,500 and your attorney fees for the two hours you were here today also.

MS. ROGERS: I think we estimated trial time in there.

THE COURT: You did? Then 11,000. What about the COBRA now?

MS. ROGERS: I think she's going to be able to get it.

THE COURT: Well, make sure that he signs all the papers necessary to effectuate it, and I want him to be responsible for paying it. Again, we know that he probably won't, but that will be a sum that will be ongoing, that if he ever gets over his cocaine addiction and starts making the – – he can make a half million dollars a year without any problem, with his experience.

So, hopefully, she will be able to come back and ask for all those sums, and she should be awarded $5,000 a week alimony.

MS. ROGERS: We have one other point, and he was under an order to pay the property taxes, and they've not been paid.

THE COURT: Let's get a judgment against him.

MS. ROGERS: For that amount?

THE COURT: Right, for that amount.

MS. ROGERS: And then tax costs to him?

THE COURT: Right. You're not afraid of him, are you?

MS. ROGERS: I think a restraining order for him not to come in her home is appropriate.

THE COURT: I was wondering. Somebody that's on drugs that bad, he's not used to living that lifestyle and – –

MS. ROGERS: He'll do thing like call her repeatedly all day long when he's – –

THE COURT: So, okay. he needs to be restrained from calling or coming around the home.

What do you want to do with the leased car problem?

MS. ROGERS: I think we ought to award him the Freelander, if he still has it, and the motorcycle, if he still has it, and award her the lease, and

-19-

that's all she can do is she's got to pay – – I think he's on that lease too. It's not in your name?

MRS. HUNT: No.

THE COURT: Then we'll make him continue paying it until it's paid out in – – there isn't a car that she wants that has – –

MS. ROGERS: Well, Your Honor, we think it's been a total – – the Freelander that he – – we think he lost his license, so I think that's the only vehicle. And then the son has a vehicle, and she wants the son to keep that. She's hoping she's going to go back to school.

THE COURT: Okay. So Gresham Smith needs to – – including the 2005 overage of a thousand and the 12,000 that they have now and $53 at this time that belongs to the parties, she will get all those funds.

Good luck.

MS. ROGERS: And each awarded their own accounts because we think he's got a bank account. We don't know what's in it, and then award her her Raymond James accounts.

THE COURT: Yes.

MS. ROGERS: Thank you, Your Honor. I'll draw the order.

The Final Judgment of the court entered February 14, 2005, reflects essentially the in-court pronouncements of the court at the conclusion of the February 7, 2005, hearing.

Mr. Hunt filed a timely Notice of Appeal and then employed counsel who, on May 16, 2005, filed a motion to be allowed to get a transcript of the trial court proceedings, and on June 2, 2005, filed a motion to clarify the property provisions of the February 14, 2005, Final Decree. These motions were heard on June 24, 2005, and an order was entered on July 6, 2005, providing:

This cause came to heard on the 24th day of June, 2005, before the Honorable Judge Carol Soloman, on the motion of Mr. Hunt for clarification and to stay and to have access to the transcript of the Court hearing. The Court, after hearing the argument of counsel, was of the opinion that given the fact that Mr. Hunt did not defend himself in the divorce trial but left prior to presenting his case so that the sole record available to the Court of Appeals would be the record of the Wife, that having a transcript of the proceedings and pursuing an appeal in this matter likely frivolous, but that the Court would grant Mr. Hunt's motion to obtain such transcript on the condition that he pay for the cost of the per diem and the original transcript and provide Wife's counsel One Thousand Five Hundred Dollars ($1,500) toward her costs in obtaining a copy of the transcript and defending the appeal. It is, therefore,

**ORDERED, ADJUDGED AND DECREED** with regard to any clarification, it was the Court's intention that all monies from Mr. Hunt's relationship with Gresham Smith Partners of any source whatsoever and specifically including the year-end payment that was being held in the trust account of Craig Gabbert should be paid to Mrs. Nancy Hunt and the Court believed that its Order directing that "all

monies" and all retirement monies owned or titled or earned by Mr. Gary Hunt be paid to Mrs. Nancy Hunt was clear and that this should have been done by March 1, 2005, and that this included some $109,000 due to Mr. Hunt from the partnership earlier this year; and it is further

**ORDERED, ADJUDGED AND DECREED** that the Husband's motion to stay the sale of the recreational vehicle awarded to the Wife in the divorce and for which Wife had been making the payments on the note, is denied; and it is further

**ORDERED, ADJUDGED AND DECREED** that Mr. Hunt's motion to obtain a transcript of the proceedings is granted on the condition that he pay the per diem cost of the court reporter and for the original transcript and provide Wife's counsel One Thousand Five Hundred Dollars ($1,500) toward her costs in obtaining a copy of the transcript and defending the appeal.

Mr. Hunt asserts on appeal that the trial court erred in the division of marital property, in refusing to grant Mr. Hunt a continuance and in awarding attorney's fees to Mrs. Hunt. The trial court did not err in declining to grant Mr. Hunt a continuance. The marital property disposition, however, is another matter altogether. No court, trial or appellate, is free to disregard legislative mandates. Tennessee Code Annotated section 36-4-121(c) is clear and unambiguous.

(c) In making equitable division of marital property, the court shall consider all relevant factors including:
(1) The duration of the marriage;
(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
(4) The relative ability of each party for future acquisitions of capital assets and income;
(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
(6) The value of the separate property of each party;
(7) The estate of each party at the time of the marriage;
(8) The economic circumstances of each party at the time the division of property is to become effective;
(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;
(10) The amount of social security benefits available to each spouse; and
(11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c).

If the mandatory provisions of this section require construction, appellate courts in Tennessee have spoken clearly. Trial court decisions "must be guided by the factors in Tennessee Code Annotated section 36-4-121(c)." *Brown v. Brown*, 913 S.W.2d 163, 168 (Tenn.Ct.App.1994). The Supreme Court of Tennessee has made it clear that consideration of these statutory factors is mandatory, *Flannary v. Flannary*, 121 S.W.3d 647, 650-51 (Tenn.2003), and must occur without the consideration of marital fault. Tenn.Code Ann. § 36-4-121(a)(1), *Bowman v. Bowman*, 836 S.W.2d 563, 567-68 (Tenn.Ct.App.1991), *Brown v. Brown*, 913 S.W.2d at 168.

The proceedings below and the orders of the trial court make it clear that the trial court gave no consideration to these statutory factors, but decided the marital property issue solely on the cocaine addiction of Mr. Hunt. The end result is that he is stripped of all marital property except for ten percent (10%) of a single marital asset, that being the buy-out payments from Gresham Smith and Partners. Everything else is simply awarded to Mrs. Hunt. While an adequate record could possibly justify such draconian measures, the record before this Court does not justify the disparity and is patently inequitable, especially in view of the statutory mandate against consideration of marital fault in the distribution of marital property.

The judgment of the trial court granting the divorce to Mrs. Hunt is affirmed. The judgment as to all matters of marital property, spousal support and the award of attorney's fees to Mrs. Hunt is reversed and the case remanded to the trial court for a new trial as to these issues. Costs of the cause are assessed to Appellee, Nancy Woodall Hunt.

_____
WILLIAM B. CAIN, JUDGE